**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. C 02-388 PJH |
| v. | **ORDER DENYING DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF HANDWRITING EXAMINER** |
| ALCUIN OREGANA, | |
| Defendant. | |

On September 21, 2005, this court granted defendant's motion for a *Daubert* hearing regarding San Francisco Police Department (SFPD) forensic document examiner, Susan Morton's proposed testimony. *See Daubert v. Merrell Dow Pharms.*, *Inc.*, 509 U.S. 579 (1993). The court held the *Daubert* hearing on November 21 and December 2, 2005. Ms. Morton testified at the hearing, as did Michael J. Saks, Professor of Law and Psychology at Arizona State University. Additionally, the parties submitted numerous exhibits. On December 2, 2005, this court issued a tentative ruling denying Oregana's motion to exclude Ms. Morton's testimony.

Having considered the testimony, the exhibits, the papers, and pertinent legal authorities, this court DENIES Oregana's motion for the reasons stated on the record on December 2, 2005, and as follows.

**DISCUSSION**

**A.     Legal Standard**

Under Federal Rule of Evidence 702, "the trial judge must ensure that any and all

scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The Supreme Court later clarified that this applies not only to scientific testimony, but to all expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999). In analyzing the reliability of Ms. Morton's testimony, this court considers: (1) whether the theory or technique can be or has been tested; (2) whether the technique has been subject to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) the general acceptance of the method within the relevant community. *Daubert*, 509 U.S. at 593-94.

The court recognizes that the reliability of handwriting analysis has been debated among the courts, with differing results. *See, e.g., Gantt v. Roe*, 389 F.3d 908, 915 n. 9 (9th Cir. 2004) (in habeas case, noting that handwriting analysis is "not an exact science" and that at least one district court has found that the evidence "must be used with caution"). However, as this court noted on the record, the Ninth Circuit has not concluded that such evidence is *per se* reliable or unreliable. In fact, in *United States v. Prime*, the Ninth Circuit held that district courts should evaluate the reliability of handwriting experts on a case-by-case basis, rather than issuing "general pronouncements" regarding the reliability or unreliability of such testimony. 363 F.3d 1028, 1032 (9th Cir. 2004), *cert granted on other grounds and judgment vacated*, 125 S.Ct. 1005 (2005) (upholding district court admission of the expert handwriting testimony after court held "a *Daubert* hearing where both sides were allowed to offer voluminous materials regarding the reliability of the proposed testimony").[1]

As the court noted on the record, the evidence presented by the government in this case was very similar to that before the district court in *United States v. Prime*. *See* 220 F.Supp.2d 1203 (W.D. Wash. 2002) (affirmed by Ninth Circuit). In *Prime,* the defendant, along with three co-conspirators, was charged with and convicted of conspiracy to commit

---

[1]This court finds the Ninth Circuit's decision and reasoning in *Prime* persuasive in spite of the fact that the judgment was ultimately vacated on other grounds. 363 F.3d 1028 (9th Cir. 2004) *cert. granted on other grounds*, 125 S.Ct. 1005 (2005) (granting cert and remanding to Ninth Circuit for reconsideration in light of *United States v. Booker*, 125 S.Ct. 738 (2005)).

wire fraud, conspiracy to manufacture counterfeit securities, and possessing, manufacturing, and uttering counterfeit securities. The prosecution elicited the expert opinion of Kathleen Storer, a forensic document examiner, regarding the defendant's authorship of counterfeit money orders and other incriminating documents.

After the defendant moved to exclude the expert testimony, the district court held a *Daubert* hearing. The court denied the defendant's motion, and Storer was allowed to testify. The Ninth Circuit subsequently upheld the district court's admission of the evidence under *Daubert*. The Ninth Circuit agreed with the district court's conclusion that the *Daubert* inquiry was "case-specific," and "was not intended to ask the 'larger question' regarding the reliability of a particular technique in general." *See* 220 F.Supp.2d at 1210; 363 F.3d at 1033.[2] In affirming the district court, the Ninth Circuit noted that the court had "thoroughly and specifically analyzed the reliability of [the handwriting expert's] testimony with respect to each of the *Daubert* factors." 363 F.3d at 1032-1035.

**B.     Analysis**

The government offered the testimony of Ms. Morton, who the court found eminently qualified and reliable on the subject of handwriting analysis. The defense offered the testimony of Professor Saks, who has completed extensive research in the area of scientific evidence, but has never performed any forensic document examination himself. Professor Saks' testimony was marginally, if at all, relevant to Ms. Morton's practices and procedures specifically. Instead, Professor Saks' testimony pertained more to the validity of handwriting analysis generally. The Ninth Circuit, however, instructs this court to look at the facts specific

---

[2] The district court noted that

> [i]n other words, all applications of handwriting identification testimony are not at issue in the motion. . . . Rather, the court [should] evaluate the reliability of handwriting expert testimony within the confines of the facts of [the] case. When the focus of the analysis shifts from the general to the specific, the number and nature of samples of questioned and known documents become important, as does the particular experience and training of the expert and soundness of the method actually employed.

*Id.*

3

to this case.

The government bears the burden of proving that Ms. Morton's proffered testimony is sufficiently reliable to be admissible under Rule 702. For the reasons that follow and for those stated on the record, the court finds that the government has satisfied its burden based on the court's consideration of the five relevant *Daubert* factors.

### 1. Whether the Theory or Technique can be or has been Tested

As Ms. Morton testified, she analyzes handwriting by comparing known sample(s) of handwriting to the questioned document. Here, Ms. Morton testified that the two known samples from Oregana that she employed in her comparison and in reaching a positive identification were sufficient and, in fact, fairly extensive. The court is persuaded that the known documents in this case were sufficient.

Additionally, the court finds Ms. Morton's qualifications and training impressive. Ms. Morton has been employed as a document examiner for nearly thirty-five years. In that time, she spent twenty-two years with the United States Postal Inspection Service. She has taught and published numerous articles on forensic document examination. She has attended more than one hundred related conferences in her career and is a fellow of the American Academy of Forensic Sciences, Questioned Document Section. She is also a member of the American Society of Questioned Document Examiners. In her career, Ms. Morton has conducted thousands of forensic document examinations.

Additionally, the court finds that, as noted on the record, although the science is evolving, it has nevertheless been sufficiently tested nationally as well. Like the expert in *Prime*, Ms. Morton testified specifically regarding studies conducted by Professor Sargur N. Srihari in support of the proposition that handwriting is individualistic. 11/21/05 Transcripts at 23; *see also Prime*, 363 F.3d at 1033.

////

### 2. Whether the Technique has been Subject to Peer Review and

4

**Publication**

Ms. Morton's technique has been subjected to peer review on numerous occasions. She testified that for the first five years of her career, all of her work was peer-reviewed. Subsequently, during her twenty-two years with the Postal Service, her work was also "almost always" peer-reviewed. Although her work in this particular case was not peer-reviewed, Ms. Morton testified that ten percent of her work at the SFPD is peer-reviewed. Since the advent of proficiency tests in the 1980's, Ms. Morton has taken at least two proficiency tests per year.

Additionally, Ms. Morton testified regarding several studies conducted by Professor Moshe Kam, which were published and peer-reviewed, that lend credence to the techniques employed by Ms. Morton specifically and professional document examiners in general. *See* 11/21/05 Transcripts at 20-23.

### 3. The Known or Potential Rate of Error

Ms. Morton testified that based on the results of peer review, she believes her personal error rate is less than 1%. 11/21/05 Transcripts at 42. Additionally, Dr. Kam's studies which tested whether qualified forensic document examiners perform better than lay people comparing handwriting, demonstrated that professional document examiners outperformed lay people in identifying false-positives. *Id.* at 20-23.

### 4. The Existence and Maintenance of Standards Controlling the Technique's Operation

Ms. Morton testified that she begins the document examination process by ensuring that she has adequate questioned and known samples. 11/21/05 Transcripts at 30; *see also* Exh. A, Susan Morton, *Basis of Handwriting Identification*. This means that the known and questioned documents must contain the same type of writing, for example, script writing in this case, the same letters, and both must be freely and naturally written. *Id.* at 30. She then usually examines first the known samples, looking for points of individuality, which include, among other things, height ratios, spacing, the formation of complex letters, design, and the connections between letters. It is then Ms. Morton's practice to sketch the questioned writing,

which "forces [her] to pay attention to all of the particulars and . . . provides a record. . . ." Exh. A. In this case, Ms. Morton sketched a sample from the questioned document and the known documents. *See id.* After sketching the writings and making a comparison of any similarities and dissimilarities in the questioned and known documents, Ms. Morton reaches a conclusion. This conclusion is based on a nine-point scale, with a positive identification being the highest. In this case, Ms. Morton made a positive identification, and concluded "that the writings were similar in every significant way that [she] observed, and that there were no significant differences." 11/21/05 Transcripts at 31.

In its December 2, 2005 tentative ruling, the court noted that it was initially surprised to learn about the degree of subjectivity in handwriting analysis. However, upon further reflection, the court also noted that there is a similar degree of subjectivity in many medical and scientific fields. For example, in this very case, the government's and defendant's experts at the competency hearing disagreed regarding the interpretation of various psychological tests and reports.

The subjectivity does not render the science unreliable. In *Prime*, the Ninth Circuit recognized that "any lack of standardization is not in and of itself a bar to admissibility in court." 363 F.3d at 1034. Here, the testimony was sufficient that Ms. Morton followed standards regarding document examination. That her methodology may vary somewhat from other national handwriting standards does not prohibit her testimony under *Daubert*.

Moreover, many of Ms. Morton's methods are in accordance with recognized standards. For example, she utilizes the standard nine-point scale in expressing her ultimate conclusion regarding whether the samples are a match, a scale that "was established under the auspices of the American Society for Testing and Materials." *Id.* Additionally, Ms. Morton testified that the SFPD lab recently gained the accreditation by the American Society of Crime Lab Directors (ASCLD). 11/21/05 Transcripts at 85.

**5.     The General Acceptance of the Method within the Relevant Community**

As in the *Prime* case, there was sufficient testimony that handwriting analysis is broadly accepted in law enforcement agencies, including the SFPD, the FBI, and the United States Postal Inspection Service. *Id.*

**CONCLUSION**

Here, as noted, the evidence is very similar to that before the district court in *Prime*. If anything, the evidence before this court reveals that the field's strides toward standardization, research, and objective testing have improved since the Ninth Circuit affirmed the district court's decision in *Prime.*

The Ninth Circuit has recognized that "handwriting analysis need not be flawless in order to be admissible." 363 F.3d at 1034. "As long as the process is generally reliable, any potential error can be brought to the attention of the jury through cross-examination and the testimony of other experts." *Id.* After careful consideration of the evidence before the court and application of the *Daubert* factors, the court concludes that Ms. Morton's testimony is admissible under Rule 702. Additionally, Ms. Morton will be allowed to provide the jury with an ultimate conclusion regarding whether the questioned and known documents constitute a match. Vigorous cross-examination and any contradictory expert testimony will serve to bring any potential errors to the jury's attention.

For the above reasons, Oregana's motion to exclude Ms. Morton's expert testimony is DENIED.

**IT IS SO ORDERED.**

Dated: December 6, 2005

_____
PHYLLIS J. HAMILTON
United States District Judge