**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

ALCUIN OREGANA,

        Defendant.

_____/

No. C 02-0388 PJH

**ORDER RE: ADDITIONAL PRETRIAL MOTIONS**

Before the court are three additional pretrial motions filed by the defendant, including: (1) motion to limit the admission of co-conspirator statements; (2) motion to introduce testimony from Dr. Perez-Arce; and (3) renewed motion to exclude testimony from the government's toolmark examiner. Having read the papers and carefully considered the relevant legal authority, the court DENIES the first and third motions set forth above; and GRANTS the second motion for the reasons that follow.

**I.    Defendant's Motion to Limit Co-Conspirator Statements**

    **A.    Background**

In one of his pretrial motions, Oregana sought to limit the introduction of co-conspirator statements by the government. At the December 14, 2005 pretrial conference, the court ordered the government to produce a list of co-conspirator statements that it sought to admit pursuant to Federal Rule of Evidence ("FRE") 801(d)(2)(E) by the end of the day on Thursday, December 15, 2005. The government, however, did not file its statement until Friday afternoon, December 16, 2005. In that statement, the government

specified that the only co-conspirator statements that it sought to admit were the victim's statements to Gideon Ilumin.[1]

The following Monday, December 19, 2005, the court pointed out in an order that the government had not made the requisite showing under *Bourjaily v. United States*, 483 U.S. 171 (1987), in support of its request to introduce statements from the victim, Henry Browning, to Gideon Ilumin. Nevertheless, the court indicated that it was inclined to admit the victim's statements as statements against the victim's penal interest under FRE 804(b)(3). *See Padilla v. Terhune*, 309 F.3d 614, 618-19 (9th Cir. 2002) ("when an accomplice makes a statement incriminating the defendant in private, to a friend, without mitigating his own role in the crime, the circumstances surrounding the statement provide a particularized guarantee of trustworthiness, which satisfies the Confrontation Clause").

Subsequently, on January 4, 2006, Oregana filed an objection to admission of the evidence as statements against penal interest under FRE 804(b)(3). On January 5, 2006, the court heard arguments on defendant's renewed motion for a competency determination and addressed the status of the subsequent "round three" of pretrial motions.[2] The court ordered the government to respond to Oregana's January 4, 2006 objection, and to make any additional requisite showing necessary for admission of the statements under the co-conspirator hearsay exception at FRE 801(d)(2)(E). The court allowed Oregana to reply as well.

**B.     Admissibility of Co-Conspirator Statements under FRE 801(d)(2)(E)**

In its January 12, 2006 filing, the government asserts that it will offer the victim's

---

[1]The government's December 16, 2005 filing stated that it submitted "the attached report of investigation (paragraphs 2 and 3 and 6) as proffer of the co-conspirator statements made to the witness Gideon Ilumin by his co-conspirator, Henry Browning, about their drug conspiracy and its relationship to the defendant."

[2]Based on defense counsels' concerns regarding defendant's competency, the court ordered that defendant undergo further psychiatric examination to assist the court in determining his present competency to stand trial pursuant to 18 U.S.C. §§ 4241(b) and 4247(b)&(c). Defendant is currently undergoing evaluation, and it is unclear when this court will receive the psychiatric report regarding his competency or when the trial will go forward.

statements not only to Gideon Ilumin, but also to Michael Canatella (and perhaps Dennis DeGuzman and Bernedette DeGuzman, although it is not clear with respect to the DeGuzmans).  The government further appears to be enlarging the scope of the conspiracy from that detailed in its December 16, 2005 filing.  According to the government, all of the above witnesses, in addition to Browning and Oregana, were members of a large conspiracy that bought methamphetamine and converted the methamphetamine to "ice," and then sold the "ice" to customers in California, New York, and Hawaii.

The government asserts that it will introduce testimony from Ilumin, Canatella, and the DeGuzmans to establish the scope of the conspiracy.  It states that it will also introduce statements made by Browning to Ilumin and Canatella in furtherance of the conspiracy.  Those specific statements are as follows:

As for Canatella, the government seeks to introduce Browning's statements to him that Oregana "was broke," and that on one occasion, Browning wired Oregana money in Reno, Nevada.  Canatella would also testify that a few days prior to Browning's murder, Browning stated that he was happy with a sample of methamphetamine that he had received from Oregana.  Additionally, Canatella would testify regarding Browning's statements of negotiation with Oregana regarding Oregana's supplying Browning with raw methamphetamine a week before Browning's murder.

As for Ilumin, as set forth in its December 16, 2005 filing, the government seeks to introduce Browning's statements to Ilumin:  (1) that Oregana could provide one or two pounds of methamphetamine at a time, but no more; (2) that Browning would get methamphetamine from Oregana when Browning's other suppliers had no product; (3) that Browning had purchased methamphetamine from Oregana at least five times between 1994 and 1997; (4) that Browning steered Oregana in Ilumin's direction for a loan because Browning did not want to loan Oregana any more money; and (5) that Browning had loaned Oregana somewhere between $2000 and $10,000, and that Oregana had not paid him back.  Additionally, per its January 12, 2006 filing, the government also seeks to introduce

Browning's statement to Ilumin that Oregana had, on 5-6 occasions, supplied Browning with the raw methamphetamine to be converted to "ice."

The government has not specified which, if any, of the victim's statements to Bernadette DeGuzman and Dennis DeGuzman that it seeks to admit.[3] It asserts that Bernadette DeGuzman was an associate of Browning's, and that she will confirm that Browning was a drug dealer. She was allegedly a drug courier for Browning, and carried drugs to Hawaii for him more than twenty times. Both of the DeGuzmans have pleaded guilty to participation in the narcotics conspiracy, according to the government.

In reply, Oregana argues that the government should not be permitted to "sneak" additional co-conspirator statements in at this time. He contends that the government should be precluded from introducing such statements for failure to include them in its December 16, 2005 filing. Oregana also makes several arguments on the merits, which are discussed below.

### 1. Analysis

#### a. Timeliness

In view of the fact that the current trial has been postponed due to further competency evaluations, the court declines to exclude the additional co-conspirator statements proffered by the government as untimely. Because of the delay in trial, there is little prejudice to defendant based on the government's January 12, 2006 disclosure of the additional statements. There remains sufficient time for defendant to conduct additional investigation, if necessary, regarding the statements disclosed on January 12, 2006. Accordingly, the court has considered those statements in its analysis and ruling set forth below.

However, the government will **not** be permitted to introduce any additional co-conspirator statements not included in its December 16, 2005 and January 12, 2006 filings.

---

[3]Oregana seems to interpret the government's filing as suggesting that it will not introduce any co-conspirator statements to the DeGuzmans because it has not addressed statements to the DeGuzmans.

### b. Legal Standard

"Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule." *Bourjaily*, 483 U.S. at 175. "There must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course and in furtherance of the conspiracy." *Id.* The existence of the conspiracy and Oregana's involvement in the conspiracy are preliminary questions of fact that must be resolved by the court by a preponderance of the evidence. *Id.* "The preponderance of the evidence standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration." *Id.* However, "[t]he inquiry made by a court concerned with these matters is not whether the proponent of the evidence wins or loses his case on the merits, but whether the evidentiary rules have been satisfied. Thus, the evidentiary standard is unrelated to the burden of proof on the substantive issues." *Id.*

### c. Victim's Statements to Ilumin ONLY

In analyzing the co-conspirator statements, Oregana separates out the victim's proffered statements to Ilumin and Canatella. With respect to Ilumin, Oregana makes two arguments. He contends that: (1) that the government has not demonstrated by a preponderance of the evidence that Browning's statements were made by a co-conspirator during the course of a conspiracy or in furtherance of a conspiracy; and (2) that the government has not offered sufficient independent evidence to connect Oregana to the alleged conspiracy.

### i. The Government has made a Sufficient Showing that Browning's Statements to Ilumin were Made by a Co-conspirator, During the Course of a Conspiracy

"In determining whether a conspiracy exists, the district court may consider the co-conspirator's statements themselves." *United States v. Torres*, 908 F.2d 1417, 1424 (9th

Cir. 1990). "However, these statements alone may not conclusively establish the existence of that conspiracy." *Id.* (citing *United States v. Silverman*, 861 F.2d 571, 577 (9th Cir. 1988)). "To determine whether evidence supports the existence of a conspiracy, relevant areas of inquiry include the nature of the scheme; the identity of the participants; the quality, frequency and duration of the each conspirator's transactions; and the commonality of times and goals." *Id.* at 1425.

The Ninth Circuit has held that the statements must have been made in furtherance of the conspiracy "while the conspiracy was in existence." *United States v. Arambula-Ruiz*, 987 F.2d 599, 608 (9th Cir. 1993). In *United States v. Vowiell*, the case relied on by Oregana, the defendant was convicted of several offenses stemming from the escape of federal prisoners. 869 F.2d 1264, 1265 (9th Cir. 1987). According to the evidence, defendant assisted and conspired to assist in the escape. The district court allowed non-incarcerated David Record, the brother of inmate, Kathy Record, to testify at Vowiell's trial that Vowiell warned Kathy that the escapees needed to leave Bakersfield, where the escapees ended up after the escape. *Id.* at 1266-67. The district court admitted the testimony as a co-conspirator statement under FRE 801(d)(2)(E) over the defendant Vowiell's objection that the statement was not "in furtherance of" or "during the course of" the conspiracy to assist the escape, because it occurred after the escape itself. *Id.* The district court disagreed, and found that the "statement was made during the conspiracy because harboring is part of the escape process and that for so long as the harboring continues and prisoners are at large, the escape is not totally complete." *Id.* at 1266.

The Ninth Circuit reversed, concluding that the district court's "legal conclusion about when a conspiracy to assist an escape ends" was wrong. *Id.* at 1267. The Ninth Circuit held that "the primary object of the conspiracy to assist an escape [is] the actual escape of the prisoners." *Id.* at 1270. As a matter of law, the court held that "a conspiracy ends once the fugitives have passed the point of immediate pursuit." *Id.* Accordingly, the court held that the district court erred in admitting the co-conspirator statements made four days after

6

the escape while the escapees were temporarily safe, and were not made in furtherance of the conspiracy to assist an escape under FRE 802(d)(2)(E). *Id.*

Here, the government has proffered both independent evidence of the existence of a conspiracy and the co-conspirator statements themselves. The independent evidence consists of Canatella's, Ilumin's and the DeGuzmans' testimony regarding the existence of a "large" conspiracy during which methamphetamine was purchased and converted to "ice." Specifically, the government has proffered that Canatella will testify regarding methamphetamine sales that he helped Browning arrange to customers in California and Hawaii, his transportation and safeguarding of large amounts of cash for Browning's purchases of the raw methamphetamine, and his plans with Browning for a large methamphetamine buy from Oregana to take place at Oregana's sister's house the week prior to Oregana's murder. There is also evidence that Bernadette DeGuzman was an associate and drug courier for Browning and transported drugs to Hawaii for him more than twenty times.

Oregana argues that there was more than one conspiracy,[4] and suggests that any conspiracy involving Oregana had ended by the time Browning made the alleged statements to Ilumin. In support, Oregana cites to grand jury testimony from Dennis DeGuzman that Browning and Ilumin were not partners at some unspecified point in time. However, Oregana has not supplied this court with anything more than a few lines from the grand jury testimony; therefore, the context is difficult to ascertain. Oregana contends that the government has failed to identify *which* conspiracy Browning's statements were made in furtherance of.

Although there may have been multiple conspiracies, or conspiracies within conspiracies, Oregana's argument does not undermine the government's preliminary

---

[4]Oregana contends that the "witnesses have actually reported . . . that Ilumin was the leader of a drug enterprise that at one time encompassed [the DeGuzmans], Canatella, and Browning. Notably, however, these witnesses also report that Browning became a competitior of Ilumin and Canatella followed Browning in his enterprise."

7

showing regarding the existence of a conspiracy. The government need not demonstrate

that Canatella and/or Ilumin, the listeners, were members of the same conspiracy. *See*

*United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993). Instead, the government

need show only that Browning, the declarant, was a member of the conspiracy in which

Oregana participated. *See id.*

There is little dispute that Browning was a member of the conspiracy that concerned

the statements he made to Ilumin (that Oregana supplied Browning with the raw

methamphetamine for the ice conversion on at least 5-6 occasions). Moreover, Oregana's

argument that the conspiracy between Browning and Oregana had ended is not persuasive

in light of the evidence offered by the government. Additionally, for purposes of Rule

801(d)(2)(E), a co-conspirator statement is admissible even if it is based on a different

conspiracy than the one charged. *See United States v. Layton*, 855 F.2d 1388, 1398 (9th

Cir. 1988) ("common enterprise or joint venture on which admission of coventurer's

statement is based need not be the same as the charged conspiracy, if any").

For these reasons, the court finds that the government has made a sufficient

preliminary showing regarding the existence of a conspiracy.

        **ii.**        **The Government has made a Sufficient Showing that Browning's Statements to Ilumin were Made by a Co-conspirator in Furtherance of that Conspiracy**

"In determining whether a statement is made 'in furtherance' of a conspiracy, the

court looks to the declarant's intent in making the statement, not the actual effect of the

statement." *Williams*, 989 F.2d at 1068.

In defining the "in furtherance of" requirement, the Ninth Circuit has held that:

[M]ere conversation between co-conspirators or merely narrative declarations are not admissible as statements in furtherance of a conspiracy. Instead, the statements must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy. In short, they must assist the conspirators in achieving their objectives. Although statements designed to induce a listener to join a conspiracy are admissible, mere casual admissions of culpability to someone the declarant has individually decided to trust are not admissible.

*Layton*, 720 F.2d at 556 (citations omitted).

8

However, "[s]tatements are generally admitted if they involve accomplishing transactions within the conspiracy, discuss past events with other members, or simply keep other members up to date." 5 Weinstein's Federal Evidence § 801.34[5]. The Ninth Circuit has held that statements similar to those made by Browning to Ilumin here were "in furtherance of the conspiracy." *See, e.g., United States v. Moody*, 778 F.2d 1380, 1382-83 (9th Cir. 1985), *amended,* 791 F.2d 707 (1986) (statement by co-conspirator that defendants would procure marijuana in Thailand was in furtherance of the conspiracy and not just idle conversation); *United States v. Paris*, 827 F.2d 395, 400 (9th Cir. 1987) (statements by drug dealer that tended to identify his source were sufficiently "in furtherance of conspiracy"). Accordingly, this court finds sufficient preliminary evidence that the statements were in furtherance of a conspiracy.

### d. Objections to Browning's Statements to Ilumin AND Canatella

As for Browning's statements to both Ilumin and Canatella, Oregana argues that the government has not offered sufficient independent evidence connecting Oregana to the conspiracy. He concedes that the government has introduced sufficient nonhearsay evidence showing that a conspiracy between Canatella and Browning existed (although, as discussed above, he does not, however, make the same concession regarding Ilumin and Browning), but argues that the government has not proffered sufficient independent nonhearsay evidence that Oregana was a member of that conspiracy.

Oregana suggests that Browning's statements to Ilumin and Canatella were made in the course of two separate conspiracies, and that the government must show Oregana's participation in and knowledge regarding the two separate conspiracies. Specifically, Oregana argues that Ilumin was not a member of the conspiracy involving Browning, Canatella, and the DeGuzmans because Ilumin had "gone out on his own" and was a competitor of Browning's.

However, as discussed above, for purposes of the Rule 801(d)(2)(E) inquiry, it is irrelevant whether Ilumin and Canatella were members of the same conspiracy with

United States District Court
For the Northern District of California

Browning, the declarant. *See Williams*, 989 F.2d at 1068. Instead, the relevant inquiry is whether Browning and Oregana were members of the same conspiracy, and whether the government has shown by a preponderance of the evidence Oregana's knowledge of and participation in the conspiracy. *Id.*

Under *Bourjaily*, "an accused's knowledge of and participation in an alleged conspiracy are preliminary facts that must be established before extra-judicial statements of a co-conspirator can be introduced into evidence." *Silverman*, 861 F.2d at 576.

The Ninth Circuit has explained:

> Because of this presumptive unreliability [of a co-conspirator's statement], a co-conspirator's statement implicating the defendant in the alleged conspiracy must be corroborated by *fairly incriminating evidence.* Evidence of *wholly innocuous conduct or statements by the defendant* will rarely be sufficiently corroborative of the co-conspirator's statement to constitute proof, by a preponderance of the evidence, that the defendant knew of and participated in the conspiracy. Evidence of *innocent conduct* does little, if anything, to enhance the reliability of the co-conspirator's statement. A co-conspirator's statement, which is presumptively unreliable hence inadmissible standing alone, is no more reliable when coupled with evidence of conduct that is completely consistent with defendant's unawareness of the conspiracy.

*Id.* at 578.

In *Silverman*, the Ninth Circuit held that the independent evidence was not sufficiently corroborative of the defendant's membership in the conspiracy, and that it was error to admit co-conspirator statements in that case. *Id.* at 579-80. The allegedly corroborating evidence in the case included evidence that the defendant drove his sister, a known drug dealer, to the airport on one occasion near the time of the sale, that his sister attempted to visit defendant during one of her "cocaine-buying expeditions," his associations with his sister, and that he concealed his identity from the DEA. The government in that case introduced evidence of another co-conspirator's statements that defendant's sister had told him that defendant was her source.

In concluding that the independent evidence was not sufficiently corroborative of defendant's role in the conspiracy, the Ninth Circuit noted that it has "consistently recognized that evidence that a defendant was merely associated with a member of a

10

conspiracy has little probative value in demonstrating the defendant's connection to the conspiracy." *Id.* at 579. It determined that the independent evidence was "completely consistent with a conclusion that [defendant] was unaware of the conspiracy." *Id.* The court noted that

> [a]lthough evidence of [the sister's] association with her brother [defendant], viewed in light of [the co-conspirator's] statement that the sister told him that defendant was her source, makes the hearsay more reliable to *some small degree*, the evidence is simply too innocent to demonstrate [defendant's] connection to the conspiracy by a preponderance of the evidence, i.e., to make the connection more likely than not.

*Id.* at 580.

Accordingly, the court concluded that "the additional evidence proffered by the government was so marginally corroborative that it failed to overcome the presumptive unreliability of [the co-conspirator's] statement. *Id.* at 580; *see also United States v. Castaneda*, 16 F.3d 1504, 1507-1509 (9th Cir. 1994) (error to admit co-conspirator statement's where independent corroborating evidence was "weak and equivocal").

This case is unlike *Silverman*. Here, the government has proffered as independent evidence of Oregana's knowledge of and participation in the conspiracy: (1) Canatella's testimony that he trusted Oregana because Browning did, and (2) Canatella's testimony that one week prior to Browning's murder, Canatella and Browning planned a methamphetamine buy from Oregana to take place at Oregana's sister's house. Government's January 12, 2006 Brief at 2. Additionally, the government has proffered independent evidence in the form of testimony from the DeGuzmans and Ilumin regarding the existence of a "large" conspiracy during which methamphetamine was purchased and converted to "ice."

This independent evidence – when considered along with Browning's statements to Ilumin and Browning's statements to Canatella– constitute a sufficient preliminary showing of Oregana's knowledge of and participation in the conspiracy to convert raw methamphetamine to "ice."

For all of these reasons, the court concludes that the government has made a

sufficient showing under *Bourjaily*, and that the statements are admissible.

The court, therefore, DENIES Oregana's motion to exclude the evidence.

## C.     Admissibility as Statements Against Penal Interest

With regard to this issue, the court considers only Browning's statements to Ilumin as set forth in the government's December 16, 2005 filing, which include Browning's statements to Ilumin: (1) that Oregana could provide one or two pounds of methamphetamine at a time, but no more; (2) that Browning would get methamphetamine from Oregana when Browning's other suppliers had no product; (3) that Browning had purchased methamphetamine from Oregana at least five times between 1994 and 1997; (4) that Browning steered Oregana in Ilumin's direction for a loan because Browning did not want to loan Oregana any more money; and (5) that Browning had loaned Oregana somewhere between $2000 and $10,000, and that Oregana had not paid him back.[5]

### 1.     Legal Standard

If the declarant is unavailable as a witness, under Rule 804(b)(3), a statement against interest is not excluded by the hearsay rule. The rule provides in pertinent part:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

The introduction of a statement under Rule 804(b)(3) requires a showing that (1) the declarant is unavailable as a witness; (2) the statement so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he believed it to be true; and (3) corroborating circumstances clearly indicate the trustworthiness of the statement. *United States v. Shryock*, 342 F.3d 948, 980 (9th Cir. 2003) (quoting *United States v. Paguio*, 114 F.3d 928, 932 (9th Cir. 1997)).

---

[5]The court considers only those statements because neither the government nor defendant have addressed the admissibility of the other statements proffered by the government under this rule.

### 2. Parties' Arguments

In his January 4, 2006 objection, Oregana asserts that the Supreme Court "has not addressed the specific issue raised here: whether statements of accomplices that incriminate a defendant when made in private to a friend are admissible under the Confrontation Clause." He argues that the Court's recent decision in *Crawford v. Washington* militates against admission of the statements under Rule 804. 541 U.S. 36, 62-65 (2004).

Additionally, Oregana argues that Browning's statements do not actually fall within Rule 804(b)(3) because they are not against his penal interests. In support, Oregana argues that both Ilumin and Browning had first-hand knowledge of each other's criminal activities, and were competitors in the drug trade. Accordingly, Oregana contends that Browning's statements to Ilumin "in and of themselves do not subject [him] to any criminal liability that he did not already face by virtue of his activities with . . . Ilumin."

Finally, Oregana argues that this case is distinguishable from the case cited by the court in its order, *Padilla*. Contrary to *Padilla* and another Ninth Circuit case cited by *Padilla*, *United States v. Boone*, 229 F.3d 1231 (9th Cir. 2000), Oregana argues that here "the government proffered no facts suggesting that the circumstances under which the statements were made imparted a particularized guarantee of trustworthiness." Instead, Oregana contends that "all we know is that the statements were made by one drug dealer to his competitor, as opposed to the context, where they were made, or who else was present." Oregana further suggests that Browning's statement could be mere "puffery" in which he was bragging about his exploits. He argues that such "idle chatter" among drug dealers is not sufficiently trustworthy for admission under Rule 804(b)(3).

The government makes no independent arguments, but merely asserts that it agrees with this court's order that the statements are also admissible under Rule 804.

### 3. Analysis

13

First, the court rejects Oregana's *Crawford*-related argument.  In *Crawford v. Washington*, the Supreme Court clarified the scope of the Confrontation Clause, holding that where out-of-court "testimonial" evidence was at issue, the Sixth Amendment did not permit such evidence to be admitted against the accused, regardless of its reliability, unless the witness was unavailable and the defendant had a prior opportunity for cross-examination.  541 U.S. 36 (2004).  If the out-of-court evidence is not testimonial, however, the rule announced in *Crawford* is inapplicable.  *Leavitt v. Arave*, 383 F.3d 809, 830 n.22 (9th Cir. 2004).

"While the *Crawford* Court left 'for another day any effort to spell out a comprehensive definition of 'testimonial,'" it gave examples of the type of statements that are testimonial and with which the Sixth Amendment is concerned – namely, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and police interrogations."  *Id.*  In *Leavitt*, the Ninth Circuit held that the victim's statements to police that she called to her house were not testimonial "because [s]he was in no way being interrogated by them but instead sought their help in ending a frightening intrusion into her home."  *Id. Crawford* is likewise inapplicable to Browning's statements here because the statements were all non-testimonial.

Second, the court concludes that Browning's statements to Ilumin are indeed against his penal interests.  "Whether a statement is in fact against interest must be determined from the circumstances of each case," and "can only be determined by viewing it in context."  *Paguio*, 114 F.3d at 933-34.  Oregana's argument focuses primarily on Browning's audience, and is essentially that Browning's statements to Ilumin are not against his penal interests because Browning himself also possessed comparable knowledge regarding Ilumin's illegal activities.  This argument is not persuasive.  Courts have held "that a reasonable person would be aware of the diserving nature of remarks even when they are made to a supposed friend."  5 Weinstein's Federal Evidence § 804.06[4][d]; *see also Padilla*, 309 F.3d at 618-20 (statements about offense made by

14

defendant's accomplice to *a friend* were admissible statements against penal interest). Here, the fact that Browning's statements were made to a friend, who also on occasion confided in Browning, does not mitigate their nature as statements against penal interest.

The third issue raised by Oregana concerns whether corroborating circumstances clearly indicate the trustworthiness of the statement. Oregana contends that the statements were essentially "chitchat" or "puffery" among drug dealers and lack the trustworthiness of the statements at issue in *Padilla*, the case cited by the court in its December 19, 2005 order.

"Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Wiliamson v. United States*, 512 U.S. 594, 599 (1994); *see also Chia v. Cambra*, 360 F.3d 997, 1005 (9th Cir. 2004) (citing *Williamson*) ("[s]elf-inculpatory statements have long been recognized as bearing strong indicia or reliability"). Where the parties have a familial relationship, or where there is evidence that the declarant made the statement to curry favor with authorities, or the statement may be partially inculpatory, corroboration is questionable. *See Paguio*, 114 F.3d at 933-34; *Shryock*, 342 F.3d at 980.

In *Padilla,* the Ninth Circuit held that the accomplice's statement to a friend regarding the circumstances of a murder was sufficiently reliable for admission under Rule 804(b)(3) even though "the statement against interest [was] made by an accomplice or co-conspirator in a private setting, rather than a custodial setting to law enforcement." 309 F.3d at 618. The *Padilla* court reasoned that the "attendant circumstances surrounding the statement . . . provide[d] a particularized guarantee of trustworthiness satisfying the Confrontation Clause." *Id.* at 619. The court noted that "[t]he speaker made his admission to . . . a close friend, in a private setting, with no reason to think the police would become involved, unabashedly inculpating himself while making no effort to mitigate his own conduct or to shift blame." *Id.*

15

In evaluating the trustworthiness of the circumstances, the Ninth Circuit expressly rejected focusing on the "reliability of the hearsay relator's testimony," in this case, Ilumin. *Id.* at 619. The defendant in *Padilla* had argued that the guarantees of trustworthiness were lacking because the listener or relator in that case "was part of a group of youths who engaged in shoplifting and drug-using sprees together" and because at the time of statement, the listener was under the influence. *Id.*

In rejecting the defendant's argument, the Ninth Circuit noted that "[a] strong argument can be made that the credibility of the witness is irrelevant to admissibility under Rule 804(b)(3)." *Id.* at 620. Instead, "[t]he jury can evaluate the perception, memory, narration, and sincerity of the witness who testifies about the hearsay declaration, and that witness testifies under oath and subject to cross-examination." *Id.* In conclusion, the court held the statement satisfied the trustworthiness requirement for admission under the Rule.

The court finds little difference between this case and *Padilla.* However, Oregana may renew his objection under Rule 804(b)(3) following Ilumin's testimony at trial. The court will at that time determine whether the circumstances surrounding the statements were sufficiently trustworthy for their admission under this rule.

**II. Defendant's Motion to Introduce Dr. Perez-Arce's Testimony**

On December 14, 2005, the day of the pretrial conference, Oregana submitted a summary of the expert testimony that he sought to elicit from Dr. Perez-Arce pursuant to FRE 702-705. The court did not have the opportunity to review the issue prior to the pretrial conference. At the conference and in its December 16, 2005 final pretrial order, the court granted the government's oral motion at the pretrial conference to exclude Dr. Perez-Arce's testimony regarding Oregana's character pursuant to Rule 404(b). The court held, however, that Oregana would be permitted to introduce Dr. Perez-Arce's testimony regarding a mental disease or defect as it relates to Oregana's ability to form the specific intents for the crimes charged. *See United States v. Twine*, 853 F.2d 676, 681 (9th Cir. 1988).

However, in the court's subsequent December 20, 2005 order, it noted that it had reconsidered the issue, and that evidence regarding a defendant's good character is indeed admissible under Rule 404(a), and that Rule 405 allows such evidence to be proven by expert testimony. However, the court ordered the parties to brief the admissibility of Dr. Perez-Arce's testimony under Rule 704(b) that:

> it is her opinion that Mr. Oregana is an extremely passive-dependent, non-aggressive individual for whom an act of deliberate violence would be totally out of character. She will testify that in performing her evaluation in this case, she ruled out certain personality disorders such as antisocial personality disorder and psychopathy which are normally symptomatic of a personality trait for violent and illegal behavior.

Oregana filed his brief on January 4, 2006. The government responded on January 12, 2006. This court's January 6, 2006 order gave Oregana the option of filing a reply on January 19, 2006, but he did not.

### A.    Parties' Arguments

Oregana argues that Dr. Perez-Arce will not testify that Oregana, or even a hypothetical person in Oregana's position, did or did not have the required mental state. Oregana argues that the proffered testimony, as set forth above, does *not* draw the ultimate inference or conclusion for the jury as to Oregana's mental state.

As support, Oregana cites to *United States v. Morales*, in which the Ninth Circuit discussed the legislative history underlying Rule 704(b). 108 F.3d 1031, 1036 (9th Cir. 1997). That history explains that under Rule 704(b), "expert psychiatric testimony would be limited to presenting and explaining their diagnoses, such as whether the defendant had a severe mental disease or defect and what the characteristics of such a disease or defect, if any may have been." *Id.* at 1036. Oregana also relies on the Ninth Circuit's decisions in *United States v. Finley*, 301 F.3d 1000, 1014-15 (9th Cir. 2002), *United States v. Younger*, 398 F.3d 1179, 1189 (9th Cir. 2005), and *United States v. Rahm*, 993 F.2d 1405 (9th Cir. 1993), discussed in detail below.

The government objects to Dr. Perez-Arce's testimony on Rule 704(b) grounds and

United States District Court

For the Northern District of California

also on the grounds that it constitutes an impermissible expert opinion.[6]  As for Rule 704(b),
the government argues that the proffered testimony "robs the jury of its fact finding function
and that of making credibility determinations."  The government relies on many of the same
Ninth Circuit cases relied on by Oregana.

### B.    Analysis

Rule 704(b) prohibits an expert testifying in a criminal case from stating "an opinion
or an inference as to whether the defendant did or did not have the mental state or
condition constituting an element of the crime charged."  "Expert testimony that compels
the jury to conclude that the defendant did or did not possess the requisite mens rea does
not 'assist the trier of fact' under Rule 702 because such testimony encroaches on the
jury's vital and exclusive function to make credibility determinations." *Finley*, 301 F.3d at
1014-15.  However, "[t]he rule does not bar testimony supporting an inference or
conclusion that a defendant does or does not have the requisite mental state, so long as
the expert does not draw the ultimate inference or conclusion for the jury and the ultimate
inference or conclusion does not necessarily follow from the testimony." *Younger*, 398 F.3d
at 1189.

In the most recent Ninth Circuit case, *Younger*, the defendant was indicted for
possession with intent to distribute cocaine base.  The district court allowed a government
expert, a police lieutenant, to testify based on a hypothetical set of facts, regarding "the
factors that are relevant to an opinion that narcotics were more likely possessed for sale or
more likely possessed for personal use. . . ." *Id.* at 1188.

The defendant argued that the expert testimony that a person or individual "who
possessed the quantity of drugs at issue possessed it for the purpose of selling it," violated
FRE 704(b) because it directly commented on his criminal intent.  The defendant noted that
the government's hypothetical questions to the expert mirrored the actual facts.  The Ninth

---

[6]The government also argues that the evidence is not relevant under FRE 401.
However, this court already determined that the evidence is relevant.

Circuit held that there was no Rule 704(b) violation, and noted that the expert "expressly denied having any particular knowledge about the defendant or what his intent may have been." *Id.* at 1189. It concluded that "[a]lthough the prosecutor's questions brought the testimony close to Rule 704(b)'s line of prohibition, the expert never directly commented on *defendant's* mental state, and the jury could have accepted his testimony and still infer that defendant was atypical." *Id.*

Oregana's proffered testimony from the doctor is qualitatively different than that in *Younger*. Unlike the expert in *Younger*, the doctor here has *very particular knowledge* regarding Oregana. This is not a case where defense counsel is going to be posing hypotheticals. Instead, while the doctor will explain her underlying diagnoses of Oregana, she will also draw a direct connection between such diagnoses and Oregana himself in so far as she testifies that someone with Oregana's mental condition or disposition would not have been likely to have committed such a crime.

Nevertheless, the court concludes that the proffered testimony is admissible based on other Ninth Circuit cases. In *United States v. Finley*, the Ninth Circuit discussed, for Rule 704(b) purposes, the distinction "between expert opinions that 'necessarily compel' a conclusion about the defendant's *mens rea* and those that do not." 301 F.3d at 1015. In *Finley*, the defendant was charged with making a false claim against the United States, attempting to interfere with the administration of the IRS, and two counts of bank fraud. Defendant sought to introduce testimony from an expert that he possessed an "atypical belief system which is very rigid." *Id.* at 1004. The district court barred the testimony under Rule 704(b) concluding that it precluded the jury from finding that the defendant possessed the necessary mens rea for the crimes charged.

In *Finley*, the Ninth Circuit subsequently discussed its "two camps" of decisions regarding Rule 704(b) testimony. The court first noted its decisions in *United States v. Morales* and *Rahm*, in which it allowed the introduction of expert testimony under the rule. *Morales*, 108 F.3d 1031 (9th Cir. 1997); *Rahm*, 993 F.2d 1405 (9th Cir. 1993). In *Morales,*

19

the defendant was charged with willfully making false bookkeeping entries, and sought to have an accounting expert testify that she had a "weak grasp of bookkeeping knowledge." 108 F.3d at 1037. The Ninth Circuit ruled that the district court erred in excluding the evidence because "even if the jury believed [the expert's] testimony that [defendant] had a weak grasp of bookkeeping knowledge (and there was evidence to the contrary), the jury still would have had to draw its own inference from that predicate testimony to answer the ultimate factual question – whether [defendant] wilfully made false entries." *Id.*

Likewise, in *Rahm*, the Ninth Circuit ruled that the district court had improperly excluded expert testimony under Rule 704(b). The defendant in *Rahm* was charged with possession of counterfeit currency and attempting to pass counterfeit currency. 993 F.3d at 1405. She sought to introduce expert psychological testimony that she had certain visual and perceptual difficulties and a lack of insight that could have resulted in a failure to examine currency closely, which the district court excluded under the rule. *Id.* at 1411. In *Finley*, the court noted that in *Rahm,* in concluding that the district court erred, the Ninth Circuit "drew a distinction between the ultimate issue – whether [the defendant] knew the bills were counterfeit – and the proffered testimony of the defendant's poor vision, from which the jury could, but was not compelled, to infer that she did not know the bills were counterfeit." 301 F.3d at 1015 (citing *Rahm*, 993 F.2d at 1411-12).

In illustrating the other "camp," that in which expert testimony compels the jury to reach a particular conclusion as to an element of the charge, the *Finley* court noted its decision in *United States v. Campos,* 217 F.3d 707, 711 (9th Cir. 2000). In *Campos*, the Ninth Circuit upheld the district court's exclusion of a polygraph expert's testimony that the defendant was being truthful when she stated that she was not aware that she was transporting marijuana. *Id.* at 711. The court "determined that the testimony compelled the conclusion that the defendant did not possess the requisite knowledge to commit the crime because polygraph test results offer an implicit opinion about the very matters at issue in the trial." *Finley*, 301 F.3d at 1015.

20

The *Finley* court ultimately determined that the expert testimony in that case regarding the defendant's atypical belief system fell into the admissible camp because "[t]he jury could have accepted [the expert's] diagnosis and still concluded that Finley knowingly defrauded the banks." *Id.* "If credited, [the expert's] testimony established only that [defendant's] beliefs were rigid and he would distort or disregard information that ran counter to those beliefs." *Id.* The court noted the "the jury was free to conclude that [the defendant] knew the notes were fraudulent despite the rigidity of his belief system." *Id.* at 1016.

Like *Finley, Morales,* and *Rahm*, the court concludes that Dr. Perez-Arce's proffered testimony falls into the admissible camp. Here, the jury will be presented with testimony and evidence not only from Dr. Perez-Arce, but from Dr. Denney as well on the very issue of the defendant's ability to form the specific intent required. As long as Dr. Perez-Arce does not testify as to the ultimate issue, as the defendant has submitted she will not, the court concludes that a jury will not be compelled, based on the doctor's testimony, to conclude that Oregana lacked the required intent. *See Rahm*, 993 F.2d at 1411-12

For these reasons, the court GRANTS defendant's motion to introduce the proffered testimony from Dr. Perez-Arce.[7]

## III. Defendant's Renewed Motion to Exclude Testimony of Toolmark Examiner

Defendant requests that the court exclude testimony from the government's toolmark examiner based on its violations of this court's order, citing *United States v. Robinson*, 44 F.Supp.2d 1345 (N.D. Ga. 1997).

### A. Background

On August 24, 2004, when the parties were anticipating an October 18, 2004 trial date, the parties negotiated and submitted to the court a comprehensive discovery order,

---

[7]The government adds an additional argument in its response. It contends that there is no evidence that Oregana suffered from the disorders that Dr. Perez-Arce diagnosed in 2003 back in 1997 at the time of the crime. However, the court concludes that the government can cross-examine Dr. Perez-Arce on this issue, and that it goes to the weight rather than the admissiblity of her testimony.

21

which required, among other things, that with respect to expert witnesses, the government disclose to defendant "all bench notes, memoranda, photographs, manuals, or any other documents prepared by, or relied on, by the experts in reaching their conclusion." Additionally, the government was ordered to disclose to defendant "all proficiency tests, peer reviews, and certifications." At that time, the government was required to disclose the items by September 15, 2004. Around the same time, on August 20, 2004, the defendant also filed a motion to exclude Coddington's testimony under FRE 702 and *Daubert*.

However, the motions and discovery deadlines were subsequently put on hold when, in September 2004, the court found that Oregana suffered from a mental defect that rendered him incompetent, and ordered a psychiatric examination. Defendant did not return from the Bureau of Prison facility in Springfield, Missouri until June 14, 2005.[8] Subsequently, the court reinstated a briefing schedule for the *Daubert* motion and other motions filed by defendant in 2004. On August 4, 2005, the government filed its brief in response to the *Daubert* motion, noting that litigation regarding Coddington's testimony was "on hold" while the government sought another ballistics examination from ATF. Accordingly, the court did not rule on the motion in September 2005 at the time it ruled on several of defendant's other motions.

On December 5, 2005, the government advised defendant and the court that it indeed intended to call Coddington as an expert at trial. On December 6, 2005, the court issued an order requiring the government to respond by December 9, 2005, to the merits of defendant's *Daubert* motion. For several reasons, including confusion and lack of receipt of that order, the government failed to respond in a timely manner. On December 12, 2005, the government filed its "summary of expert testimony." That summary responds in part to defendant's *Daubert* motion.

At the pretrial conference on December 14, 2005, defense counsel moved to

---

[8]On September 21, 2005, following a two-day evidentiary hearing, this court found Oregana competent to stand trial.

22

exclude any expert testimony from the government's ballistics expert, Terry Coddington, based on the government's failure to timely comply with this court's discovery and briefing orders. The court indicated that it would consider further defendant's motion to exclude Coddington's testimony in light of the government's delay and issue a written ruling. Subsequently, on the morning of December 15, 2005, the government filed a seven-page opposition, more comprehensive than any of its other pretrial papers, opposing defendant's motion.

On December 19, 2005, in the final pretrial order, the court denied defendant's motion to exclude the evidence, reasoning that:

> in spite of the government's inattention to the relevant deadlines, the motion to exclude Coddington's testimony in its entirety is problematic for several reasons. First, there was no court order requiring identification of the government's expert witness prior to December 5, 2005. Additionally, Rule 16(a)(1)(G) does not specify a deadline for such disclosure, and the cases have not established a bright-line rule, either. The court is not unsympathetic to defendant's assertion that the government's representations regarding the likelihood of Coddington testifying were misleading. Nevertheless, the government's December 5, 2005 notice identifying Coddington as an expert witness constitutes reasonable notice under Rule 16.

The court also set forth several discovery obligations in that order as follows:

> The government's related arguments in its December 15, 2005 filing ignore the particular circumstances of this case. The government is bound by the negotiated August 24, 2004 discovery order. Accordingly, the government is ORDERED to provide the defendant with all outstanding discovery as specified by the August 2004 order including, but not limited to (1) the specific points of comparison relied on by Coddington; (2) proficiency tests; and (3) Coddington's protocols **NO LATER THAN CLOSE OF BUSINESS MONDAY, DECEMBER 19, 2005.** Any failure to disclose such materials by that date and time will result in the exclusion of Coddington's testimony, absent the most compelling circumstances.

On December 20, 2005, one day after the government's disclosures were due pursuant to the court's final pretrial order, defendant filed a renewed motion to exclude Coddington's testimony based on the government's continuing violations of the court's orders. The government responded on January 4, 2006, and defendant replied on January 12, 2006.

**B.    Discussion**

Defendant argues that the government has not complied with the order because the discovery it provided does not include:  (1) the specific points of comparison relied on by Coddington; (2) proficiency tests; and (3) Coddington's protocols.  Defendant has attached copies of the discovery provided.

The government responds that it has provided all of the discovery available as to Coddington.  Defendant uses seven pages of his reply to argue why the discovery provided is insufficient.

The court DENIES defendant's renewed motion.   If the discovery does not exist, then it does not exist.  The government has represented that it has produced to defendant everything in its possession in compliance with the court's final pretrial order.  For this reason, it does not appear that exclusion is warranted at this time.  If, however, the government attempts to introduce evidence not provided to defendant, or it becomes apparent that the government has concealed the ordered discovery, then exclusion may be appropriate and defendant may again renew his motion.

## CONCLUSION

The court DENIES defendant's motions to exclude the co-conspirator statements and to exclude testimony from the government's toolmark examiner.  The court GRANTS defendant's motion to introduce the proffered testimony from Dr. Perez-Arce under FRE 704(b).

**IT IS SO ORDERED.**

Dated: February 21, 2006

_____
PHYLLIS J. HAMILTON
United States District Judge